# United States Court of Appeals
## For the First Circuit

―――――――

No. 22-1767

JEAN BAZILE,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

―――――――

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

―――――――

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

―――――――

William Keefe for petitioner.
Spencer Shucard, Trial Attorney, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, United States Department of Justice, and Keith I. McManus, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.
SangYeob Kim, with whom Gilles Bissonnette and American Civil Liberties Union of New Hampshire were on brief, for various First Circuit-based Immigration Law Practitioners, Nonprofit Organizations, Law School Clinics, and a Public Defender Agency, amici curiae.*

――――――――――

* The amici are more fully identified in the Appendix annexed hereto.

August 4, 2023

**SELYA**, <u>Circuit Judge</u>.  In this case, we grapple with the question of how venue is to be determined in removal proceedings.  This is a question of first impression in this circuit — and one that has divided the courts of appeals elsewhere.  After answering the venue question and confirming that venue is appropriate here, we turn to the merits and conclude that the agency's rejection of the petitioner's application for deferral of removal under the United Nations Convention Against Torture (CAT) is supported by substantial evidence on the record as a whole.  Accordingly, we deny the petition for judicial review.

I

We briefly rehearse the relevant facts and travel of the case.  The petitioner, Jean Bazile, is a Haitian national.  He entered the United States in 1997 at age seven after his father — who had already emigrated to the United States — sponsored an application for his permanent residence.  Since then, the petitioner has dwelt in Massachusetts as a lawful permanent resident.

We fast-forward to 2016.  Late that year, the petitioner pleaded guilty in a Massachusetts state court to charges of carrying a firearm without a license, <u>see</u> Mass. Gen. Laws ch. 269, § 10(a); assault and battery with a dangerous weapon, <u>see</u> <u>id.</u> ch. 265, § 15A(b); carrying a loaded firearm without a license, <u>see</u> <u>id.</u> ch. 269, § 10(n); and discharging a firearm within 500 feet of

a building, see id. ch. 269, § 12E.  The court sentenced him to thirty months' imprisonment for carrying a firearm without a license and two years of probation for each of the other offenses (to run concurrently).

In June of 2019, the Department of Homeland Security (DHS) initiated removal proceedings, serving the petitioner with a notice to appear (NTA).  The NTA charged that the petitioner was removable due to his conviction for carrying a firearm without a license, see 8 U.S.C. § 1227(a)(2)(C); 18 U.S.C. § 921(a), and directed him to appear at the Boston immigration court (where DHS had filed the NTA).

The petitioner participated in a number of virtual hearings between July of 2020 and April of 2022.  No single immigration judge (IJ) presided over these hearings but, rather, three different IJs presided at various times.  The first two IJs were physically present in Boston, but the third IJ was physically located in Fort Worth, Texas.  At all relevant times, the petitioner — who was detained — was physically present in Massachusetts.

In the course of these proceedings, the petitioner conceded removability but cross-applied for asylum, withholding of removal, and protection under the CAT.  The petitioner also applied for adjustment of status and cancellation of removal but later withdrew those applications.

- 4 -

The Fort Worth IJ held a hearing on the merits of the petitioner's claims for relief on April 13, 2022.  The petitioner, still in Massachusetts, participated virtually, as did the lawyers.  The IJ ruled that the petitioner's 2016 conviction for assault and battery with a dangerous weapon was a "particularly serious crime" that rendered the petitioner ineligible for asylum and withholding of removal.  See 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2).  This left the petitioner's claim for deferral of removal under the CAT.  See 8 C.F.R. § 1208.17(a).

In support of his remaining claim, the petitioner presented evidence of current country conditions and historical political turmoil, his own affidavit, letters from his parents and his sister, and testimony from his father, his sister, and himself.[1]  He argued that, if removed to Haiti, he would be tortured based on his family's involvement in the 1980s with Lavalas (a political party whose supporters were at one time targets of political violence).

In a bench decision, the IJ denied the petitioner's application for deferral of removal under the CAT.  The IJ found

---

[1] The IJ attempted to take testimony from the petitioner's father over the telephone, but the petitioner's father was unable either to hear or to understand the questions.  The IJ discontinued the telephonic testimony and opted instead to consider the father's letter.  Before us, the petitioner has not challenged that ruling.

the witnesses to be generally credible but concluded that the petitioner had not carried his burden of showing that he would more likely than not be tortured if returned to Haiti. Even accepting as true that the petitioner's father had been involved in the Lavalas party in the 1980s and that supporters of that party were persecuted then, the IJ reasoned that the witnesses had not sufficiently connected those historical facts to a present risk of future harm. Nor had the witnesses explained why the dangers that the petitioner's father had faced would redound to the petitioner's detriment some three decades later. For one thing, the testimony from the petitioner and his sister about potential harm was comprised primarily of secondhand information, insupportable inferences, and undue speculation. For another thing, the other evidence showed no more than widespread political turbulence, which failed to demonstrate that the petitioner would be specifically targeted upon his return. The IJ thus concluded that the petitioner's claim that he would likely be tortured was too "speculative," denied his CAT application, and ordered him removed to Haiti.

The petitioner appealed the IJ's decision to the Board of Immigration Appeals (BIA). On September 9, 2022, the BIA adopted the IJ's findings and dismissed the appeal in a written decision. This timely petition for judicial review ensued.

**II**

Before reaching the merits of the petitioner's CAT claim, an antecedent question looms. A petition for review of a final order of removal must be "filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2). In an era in which many removal hearings are conducted virtually, more than one judicial circuit may stake a plausible claim to venue. Consequently, the question as to where the IJ "completed the proceedings" may be freighted with uncertainty.

Such a question lurked in the penumbra of this case. On the one hand, the IJ who presided over the petitioner's merits hearing was physically located in Fort Worth, Texas. On the other hand, Boston, Massachusetts, was the designated hearing location and both the decision of the immigration court and its order of removal were filed and docketed there. Texas is within the jurisdiction of the Fifth Circuit whereas Massachusetts is within the jurisdiction of the First Circuit. Arguably, then, either of those circuits may be the circuit in which the IJ completed the proceedings.[2] Compare Herrera-Alcala v. Garland, 39 F.4th 233,

---

[2] To add to the uncertainty, the heading on the written version of the IJ's bench decision reads:
    United States Department of Justice
    Executive Office for Immigration Review
    United States Immigration Court
    Fort Worth, Texas

241-43 (4th Cir. 2022) with Sarr v. Garland, 50 F.4th 326, 331-33 (2d Cir. 2022).

To avoid uncertainty, we issued an order to show cause why the case should not be transferred to the Fifth Circuit. After responses were received, we reserved the resolution of the venue question to the merits panel. We have had the benefit of helpful briefing on this question by both the parties and the amici. We address the question now.

## A

Because the mechanics of removal proceedings are central to resolving the question of venue, a brief description of the process helps to set the stage. Removal proceedings are commenced when DHS serves a noncitizen with a charging document (typically an NTA) and files that document with an administrative control immigration court. See 8 C.F.R. §§ 1003.14(a), 1003.31(f). The administrative control court is one that "creates and maintains [r]ecords of [p]roceedings" for immigration courts or hearing locations within a given geographic area, with the result that all documents related to a particular case heard in those immigration

---

But the heading on the subsequent written order reads:
    United States Department of Justice
    Executive Office for Immigration Review
    Boston Immigration Court
And as a finishing touch, it should be noted that there is no immigration court in Fort Worth; there is only an immigration adjudication center, which is a type of facility at which IJs hold remote hearings for immigration courts across the country.

courts or hearing locations must be filed in that administrative control court.  Id. § 1003.11; see id. § 1003.31(f).

Many administrative control courts are situated in the same place as the courts and hearing locations whose records they are assigned to maintain.  For instance, the administrative control court for the Boston immigration court and most Massachusetts detention centers is situated in Boston.  But an administrative control court's assigned area may include courts or hearing locations in other places, in which event all records (including the charging document) would properly be filed in one place even though the hearing location is in another place.  See 8 C.F.R. § 1003.11; see, e.g., Sarr, 50 F.4th at 329-30 (noting NTA filed in administrative control court in New York and designated hearing location in Louisiana).

An NTA ordinarily includes a designated hearing location.  See 8 C.F.R. § 1003.18(b).  At the outset of the removal proceedings, the noncitizen attends a master calendar hearing, see, e.g., id. § 1240.17(b), (f)(1), either personally or virtually.  That master calendar hearing is followed by an individualized merits hearing at which both DHS and the noncitizen may present evidence on contested matters (including applications for relief from removal).  See, e.g., id. § 1240.17(f)(1),(4).

Flexibility is the watchword:  hearings may be conducted in person, by video conference, or (in certain circumstances) by

telephone.  See 8 U.S.C. § 1229a(b)(2); 8 C.F.R. § 1003.25(c).  In
the interest of efficiency, the Executive Office for Immigration
Review (EOIR), which administers the immigration court system, has
encouraged the use of video conferencing as a more efficacious
alternative to in-person hearings.  See Memorandum from James R.
McHenry, Dir., EOIR, to All of EOIR, re: No Dark Courtrooms, at
1-2 (Mar. 29, 2019).  When a hearing is held by video conference,
the IJ, the noncitizen, and the lawyers may all be physically
present in different locations — and it may be that none of them
is present at the hearing location designated in the NTA.  See
Matter of Garcia, 28 I. & N. Dec. 693, 696 (BIA 2023).  What is
more, different IJs, physically present in different locations,
may preside over successive hearings in a single case.  See id. at
697 n.5.  The noncitizen and his counsel may not learn the identity
and whereabouts of the presiding IJ until a hearing is about to
commence.  See id. at 697 & n.5.

        At or after the conclusion of the merits hearing, the IJ
— from whatever location — may either render a bench decision or
issue a written decision.  See 8 C.F.R. § 1003.37.  The IJ then
files a written order with the immigration court, and the
immigration court dockets it.  Once the IJ's decision has been
embodied in the written order and placed on record, either party
may appeal to the BIA.  See id. § 1003.38.  Thereafter, a
noncitizen who is aggrieved by a decision of the BIA may petition

for judicial review of that decision in "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings."  8 U.S.C. § 1252(b)(2).

### B

Against this backdrop, we turn to the question of where the IJ "completed the proceedings" for purposes of judicial venue. Id.  Our sister circuits have reached a wide variety of conflicting conclusions on this question.  See, e.g., Sarr, 50 F.4th at 332 (holding that judicial venue lies in the court "where — absent evidence of a change of venue — proceedings commenced," meaning the immigration court "identifi[ed]" on the charging document); Herrera-Alcala, 39 F.4th at 240-41 (holding that physical location of IJ during the hearing determines where IJ "completed the proceedings"); Ramos v. Ashcroft, 371 F.3d 948, 949 (7th Cir. 2004) (concluding that IJ "completed the proceedings" where "the court is located," meaning "where all parties were required to file their motions and briefs" and "where the orders were prepared and entered"); Plancarte Sauceda v. Garland, 23 F.4th 824, 832 (9th Cir. 2022) (concluding that IJ "completed the proceedings" at hearing location designated on charging document or initial hearing notice unless IJ had granted change of venue); Yang You Lee v. Lynch, 791 F.3d 1261, 1266 (10th Cir. 2015) (considering various factors to determine where IJ "completed the proceedings").  We add our voice to this cacophony of viewpoints.

- 11 -

As always, our starting point is the text of the statute. See Woo v. Spackman, 988 F.3d 47, 50-51 (1st Cir. 2021). Here, that text is not a model of clarity. See Georcely v. Ashcroft, 375 F.3d 45, 48 (1st Cir. 2004). In particular, it is unclear whether an IJ may be said to "complete[] the proceedings" when she presides over the final session of the merits hearing, when she renders her decision, when she files the ensuing order, or at some other juncture.

Even so, the statutory text serves to narrow our inquiry. The plain meaning of "completed" defenestrates the notion that the IJ completes the proceedings simply by presiding over the last phase of the hearing. The proceedings cannot conceivably be "completed" until the IJ renders a decision.

We add, moreover, that if the IJ does not complete the proceedings by presiding over the hearing, the physical location of the IJ during the hearing makes no sense as the basis for judicial venue. Such an interpretation, in addition to being foreclosed by the statutory text, would lead to anomalous results. It would locate judicial venue wherever the IJ happened to be during the last phase of the hearing which, in a virtual world, could be almost anywhere. And it would create uncertainty for the parties, who, as we have said, may only learn the location of the IJ presiding over a particular hearing shortly before the hearing takes place, and long after the briefing is finished.

The use of the word "proceedings" is also instructive. That word, as used elsewhere within the statute and regulations, refers to the broader removal proceedings. See, e.g., 8 C.F.R. § 1003.14(a); cf. Matter of Garcia, 28 I. & N. Dec. at 698 (discussing location of "proceedings" for choice of law purposes). The word, therefore, should be accorded the same meaning in construing section 1252(b)(2). See United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4-5 (1st Cir. 1997). Consequently, it would be anomalous to say that the IJ "completed the proceedings" simply by rendering a decision. After all, that action alone has no formal effect on the broader removal proceedings: it is only when the removal order is filed that the proceedings may plausibly be said to have been completed. Cf. Georcely, 375 F.3d at 48 (noting general rule that judicial order is effective only after it is filed and docketed).

This construction aligns with the reality of events: as noted above, an IJ sometimes renders her decision at the end of the merits hearing and sometimes renders her decision weeks or months later. See 8 C.F.R. § 1003.37. This means that the IJ — at the moment when she renders the decision — could be at a different location than she was when the hearing took place. If her location was the critical factor in the venue calculus, that factor would import a large dollop of unpredictability into the venue determination.

For the purposes of section 1252(b)(2), then, we conclude that where the IJ completes the proceedings — that is, judicial venue — must align with administrative venue. Administrative venue is defined by regulation as the court where "proceedings" commenced when the charging document was filed (unless a formal change of venue has been effected).  Id. § 1003.14(a); see id. § 1003.20(a).  If the proceedings commenced there, it is logical that they must be completed there.  An IJ may grant a change of venue only upon the motion of a party.  See 8 C.F.R. § 1003.20(b).  Given this framework, an IJ necessarily completes the proceedings for the purposes of section 1252(b)(2) at the court where the proceedings are commenced, absent a formal change in administrative venue.

BIA precedent is in lockstep with our interpretation of section 1252(b)(2).  Although we are not obliged to afford any deference to the BIA when interpretating that statute, see Matter of Garcia, 28 I. & N. Dec. at 702 n.10, an agency's interpretation may be persuasive in light of the agency's expertise, see Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 55 (1st Cir. 2014) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  So it is here.

In Matter of Garcia, the BIA addressed the question of which circuit's law applies in removal proceedings before the immigration courts and BIA.  See 28 I. & N. Dec. 693.  The BIA

noted that each circuit court of appeals applies the law of its circuit to petitions for judicial review of BIA decisions, and the reasonable expectations of litigants are best served if the choice of law remains the same as a case moves through the immigration court, the BIA, and the circuit court.  See id. at 698-700, 699 n.8, 702 n.10.  The BIA thus concluded that the law applied in immigration proceedings should derive from the agency's best interpretation of section 1252(b)(2).  See id.

After surveying the conflicting circuit precedents, the BIA endorsed an interpretation of section 1252(b)(2) that ties judicial venue to "the geographic location of the [i]mmigration [c]ourt where [administrative] venue lies, namely where jurisdiction vests and proceedings commence upon the filing of a charging document."[3]  Id. at 701, 703; see 8 C.F.R. §§ 1003.14(a), 1003.20(a).  In the process, the BIA explicitly repudiated a rule

---

[3] There is a wrinkle.  By regulation, administrative venue lies where proceedings are commenced by the filing of "a charging document . . . with the [i]mmigration [c]ourt."  8 C.F.R. § 1003.14(a); see id. § 1003.20(a).  On its face, this language may seem to link administrative venue to the administrative control court.  See 8 C.F.R. §§ 1003.11, 1003.31(f).  But the BIA recently made pellucid that administrative venue does not "necessarily lie[] at an administrative control court solely because a charging document is filed there."  Matter of Garcia, 28 I. & N. Dec. at 704.  The BIA implied that the location where proceedings are commenced pursuant to 8 C.F.R. § 1003.14(a) may be discerned — at least in some circumstances — by reference to the hearing location listed on the charging document, but left the matter unsettled.  See id. at 704-05.  So do we:  because the administrative control court and the designated hearing location are the same in the case at hand, there is no need for us to choose between them.

that the physical location of the IJ should control the venue determination, concluding that such a rule was unworkable.  <u>See id.</u> at 702-03.

Matter of Garcia now requires IJs and the BIA to apply the law of the circuit where administrative venue lies.  This fits seamlessly with our interpretation of section 1252(b)(2), which ties the determination of judicial venue to the immigration court in which proceedings are commenced — that is, to the court where administrative venue lies — unless a motion for change of venue has been granted.

c

In this case, all roads lead to Rome.  The charging document was filed in the Boston immigration court and the hearing location designated in the document was the Boston immigration court.  The proceedings clearly commenced there.  At no point thereafter did any party serve a motion to transfer venue.  And at the end of the case, the removal order was filed and docketed in the Boston immigration court.

The foregoing facts leave no doubt that judicial venue in this court is proper.  That the IJ attended the proceedings remotely from Fort Worth, Texas, is of no consequence with respect to the venue determination.

**III**

This brings us to the agency's denial of the petitioner's application for CAT relief.  To prevail on a CAT claim, a noncitizen must establish — through specific objective evidence — that "it is more likely than not that he . . . would be tortured if removed to" his homeland.  8 C.F.R. § 1208.16(c)(2); see Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021).  In this context, torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity."  8 C.F.R. § 1208.18(a)(1).

In removal proceedings, the focal point of our review is usually the decision of the BIA.  See, e.g., Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020).  But where, as here, "the BIA embraces the decision of the IJ, 'merely add[ing] its gloss to the IJ's findings and conclusions, we treat the two decisions as one.'"  Id. (alteration in original) (quoting Murillo-Robles v. Lynch, 839 F.3d 88, 91 (1st Cir. 2016)).  In this spirit, we sometimes refer to the combined decisions of the IJ and the BIA as the decision of the agency.

Our review of the agency's decisionmaking is two-tiered: we examine the agency's answers to legal questions de novo and

consider whether its factual findings are supported by substantial evidence. See Ali v. Garland, 33 F.4th 47, 54 (1st Cir. 2022). The latter standard is deferential and, under it, we will uphold the agency's factual findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." López-Pérez v. Garland, 26 F.4th 104, 113 (1st Cir. 2022) (quoting Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004)).  Refined to bare essence, this means that we will not disturb the agency's determination on a fact-based issue "unless the record evidence 'compel[s] a reasonable factfinder to make a contrary determination.'"  Id. at 110 (alteration in original) (quoting Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004)); see 8 U.S.C. § 1252(b)(4)(B).  For purposes of the substantial evidence test, predictive findings as to what may or may not transpire at a future date are regarded as findings of fact. See DeCarvalho v. Garland, 18 F.4th 66, 73 (1st Cir. 2021); Samayoa Cabrera v. Barr, 939 F.3d 379, 382-83 (1st Cir. 2019).

Here, the petitioner asserted that — if removed to Haiti — he was likely to be tortured based on his family's (and particularly his father's) past affiliation with the Lavalas party.  The record reflects that Lavalas was a political party and that its supporters were targeted by opposition parties during the political upheaval of the 1980s.  The IJ accepted as true that the petitioner's father was involved with the Lavalas party in the

1980s and that adherents of that party were targeted then. Turning to the present day, the IJ acknowledged that Haiti is in the midst of political turmoil. The petitioner, though, had failed to adduce any probative evidence linking the past targeting of Lavalas supporters to a threat of present harm. Nor had the petitioner adduced any probative evidence linking the current political turmoil to a particularized risk of torture. The IJ thus determined that the threat of torture was "speculative" and that the petitioner had not carried his burden of proof.

The BIA adopted the IJ's findings. In addition, it noted that the petitioner had not claimed to have been threatened in Haiti. Given the paucity of proof, the BIA concluded that the IJ had not clearly erred in finding that the petitioner's "fear of harm based on his father's experiences in Haiti three decades ago is too speculative to establish that he personally faces a clear probability of being singled out for torture upon return to Haiti."

In our view, the agency's findings are fully supportable. Surely, the record does not compel a contrary conclusion. As the agency found, even if the petitioner's father was involved with a political party that was a target of violence in the 1980s and even if Haiti is currently in turmoil, there is insufficient evidence connecting those two facts to a present risk of torture that is particular to the petitioner.

To be sure, the petitioner vouchsafed during his testimony that he believed that violence against Lavalas supporters is "worse now" than it was when his father fled. In the same vein, he expressed his belief that some family members had been "harmed" in Haiti in the past ten years. But he neither provided any first-hand information nor offered any meaningful details. Such generalized statements of belief, devoid of specifics, are insufficient to bear the weight of a CAT claim. See Alvizures-Gomes v. Lynch, 830 F.3d 49, 54-55 (1st Cir. 2016).

So, too, the petitioner's sister — who echoed his beliefs — provided only generalized information about possible harm to family members. She admitted that most of her information was secondhand. Once again, such evidence falls short.

In an effort to bridge this gap, the petitioner points to a 2008 article summarizing books about the Lavalas movement. That article, however, deals with events occurring in the 1990s and early 2000s. As the agency found, such evidence does not furnish a plausible basis for concluding that Lavalas supporters are likely to face torture in Haiti at present.

Nor does the evidence lay any foundation for a finding that the petitioner's father's political affiliation in the 1980s would be imputed to the petitioner. Although the petitioner conclusorily asserted that he would be known immediately to the police and targeted by gangs working with them as his father's

son, he provided no corroborating evidence to support that assertion. Uncorroborated conjecture, without more, cannot carry the day on a claim under the CAT. See Sanabria Morales v. Barr, 967 F.3d 15, 20 (1st Cir. 2020).

Struggling to regain lost ground, the petitioner notes that credible testimony, without corroboration, may suffice to satisfy a noncitizen's burden of proof on a claim for CAT protection. See 8 C.F.R. § 1208.16(c)(2). That is true as far as it goes — but it does not take the petitioner very far. A noncitizen's testimony is only sufficient on its own if the import of that testimony is probative enough to allow him to carry his burden of proof. See id. To clear that bar, the testimony must provide specific objective evidence showing that the noncitizen is more likely than not to be tortured if removed to his homeland. See Bonnet, 20 F.4th at 84; cf. Garland v. Ming Dai, 141 S. Ct. 1669, 1680 (2021) (explaining, in asylum context, that "even if the BIA treats an alien's evidence as credible, the agency need not find his evidence persuasive or sufficient to meet the burden of proof"). The BIA upheld the IJ's determination that the petitioner's evidence did not measure up to this benchmark, and that determination is supported by substantial evidence.

The petitioner next contends that the agency failed either to consider or to give appropriate weight to the country conditions report and the 2008 article. We agree with the BIA

that such a contention is belied by the record.  To begin, an IJ
"need not discuss ad nauseum every piece of evidence" as long as
she has "given reasoned consideration to the evidence as a whole,
made  supportable  findings,  and  adequately  explained  [her]
reasoning."  Alzaben v. Garland, 66 F.4th 1, 10 (1st Cir. 2023)
(quoting Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir. 2007)).  In
the case at hand, the IJ's decision checked each of these boxes.

     Here, moreover, the petitioner's complaint, stripped of
rhetorical  flourishes,  seems  to  be  less  about  a  failure  of
consideration and more about the fact that the agency did not treat
his allegedly corroborating evidence as persuasive support for his
CAT claim.  That complaint will not wash:  general evidence about
country  conditions  cannot  compensate  for  the  lack  of  specific
evidence showing a particularized risk of torture.  See Alvizures-
Gomes, 830 F.3d at 55; see also Mendez-Barrera v. Holder, 602 F.3d
21, 28 (1st Cir. 2010) (explaining that, "[a]lthough such [country
conditions]  reports  are  sometimes  helpful  to  an  alien's  claim,
their  generic  nature  is  such  that  they  are  rarely  dispositive").
The petitioner conceded that the country conditions report showed
only generalized political turmoil, with no particular mention of
either  the  Lavalas  party  or  its  adherents.   The  petitioner
attempted  to  connect  the  country  conditions  report  with  the
violence against supporters of Lavalas in the 1980s by conclusorily
asserting that "it's the same situation."  But political alignments

are notoriously fragile and crediting the petitioner's assertion would require the factfinder to assume — despite the lack of evidentiary predicate — that the same political actors are being targeted now as were being targeted then. That is a quantum leap, which the agency cannot be expected to undertake in the absence of probative evidence.

The short of it is that the IJ and the BIA addressed all of the evidence that had been introduced. They found that — on the entirety of the evidence — the specific risk of torture asserted by the petitioner was speculative. We conclude that this finding and, thus, the agency's denial of CAT protection was supported by substantial evidence on the record as a whole.

**IV**

We need go no further. The record shows that danger and violence are endemic in modern Haitian society. But the agency's finding that this generalized danger and violence will pose no particularized threat to the petitioner is supported by substantial evidence in the record as a whole. That ends the matter. For the reasons elucidated above, we hold that judicial venue is proper in the First Circuit. We further hold that the agency's denial of CAT protection is supported by substantial evidence. It follows, then, that the petition for judicial review must be

**<u>Denied</u>**.

**APPENDIX**

**Roster of Amici Curiae**

- American Civil Liberties Union of New Hampshire
- Carlos Estrada
- Committee for Public Counsel Services, Immigration Impact Unit
- Denise Acevedo Perez
- Eloa Celedon
- Emily A. White
- Greater Boston Legal Services
- Harvey Kaplan
- Immigrant Legal Advocacy Project
- Melanie Shapiro
- Katie Horigan
- Massachusetts Law Reform Institute
- New Hampshire Legal Assistance
- Nina J. Froes
- Political Asylum/Immigration Representation Project
- Robert Warren
- Ronald L. Abramson
- Rubin Pomerleau PC
- Stephanie Marzouk
- Susan Church
- The Boston College Legal Services LAB Immigration Clinic
- The Boston University School of Law Immigrants' Rights and Human Trafficking Program
- The Harvard Immigration and Refugee Clinical Program
- The Suffolk University Law School Immigration Clinic
- The University of Maine School of Law Refugee and Human Rights Clinic